**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL GLENN,** | ) | **CASE NO. 3:08CV3040** |
| | ) | |
| **Petitioner,** | ) | **JUDGE CHRISTOPHER BOYKO** |
| | ) | |
| **v.** | ) | **MAGISTRATE JUDGE GREG WHITE** |
| | ) | |
| **MICHELE EBERLIN,[1] Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | **REPORT AND RECOMMENDATION** |

Petitioner, Michael Glenn ("Glenn"), challenges the constitutionality of his conviction and sentence in the case of *State v. Glenn*, Allen County Common Pleas Case No. CR20050185. Glenn filed a Writ of Habeas Corpus (Doc. No. 1) pursuant to 28 U.S.C. § 2254 on December 31, 2008, with the United States District Court for the Northern District of Ohio. On June 15, 2009, Respondent Michele Miller ("Respondent") filed her Answer/Return of Writ. (Doc. No. 7.) Glenn filed a Traverse on September 21, 2009, (Doc. No. 11), to which Respondent replied on November 5, 2009. (Doc. No. 13.) This matter is before the undersigned Magistrate Judge pursuant to Local Rule 72.2. For reasons set forth in detail below, it is recommended that Glenn's Petition be denied.

## I.  Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts "shall be presumed to be correct." 28 U.S.C. § 2254(e)(1); *see also House v. Bell*, 283 F.3d 37 (6th Cir. 2002). The state appellate court summarized the facts underlying Glenn's conviction as follows:

---

[1]The Warden's name was recently changed to Michele Miller.

> Michael Glenn confessed to killing his ex-girlfriend, Lanette
> McDonald, and her mother, Carmen Jean [Chitman]. T.p. 3-18;
> Exhibits 19-20. He was addicted to crack cocaine and went to
> McDonald's home to demand money. *Id.* He used a heavy stick to
> bludgeon the two to death. *Id.* He stole a few items from the
> home and took McDonald's car to Toledo, where he was arrested.
> *Id.* He confessed both in Toledo and in Lima. *Id.*

> (Appellant's Brief at 2, Appellee's Brief at 3). We find these facts to be sufficient
> given the scope of the appeal. However, we note that these facts incorrectly state
> that Glenn had a relationship with McDonald when, in fact, it was Carmen Jean
> with whom he had the prior relationship. (Tr.p. 1314).

(Doc. 7-1, Exh. 15 at 2.)

## II. Procedural History

### A. Conviction

On April 29, 2005, the Allen County Grand Jury charged Glenn with one count of aggravated robbery, two counts of aggravated murder in violation of Ohio Rev. Code ("O.R.C.") § 2903.01(B), and two counts of aggravated murder in violation of O.R.C. § 2903.01(D). (Doc. No. 7-1, Exh. 1.) The four counts all stemmed from the deaths of Carmen Chitman and Lanette McDonald. All four of the aggravated murder charges carried death penalty specifications. *Id.*

Glenn, represented by counsel, pled "not guilty" and the matter proceeded to a jury trial. (Doc. No. 7-1, Exh. 2.) After Glenn was convicted on all charges, (Doc. No. 7-1, Exhs. 3-1 to 3-17), the court merged the two counts relating to Chitman's death and the two counts relating to McDonald's death. (Doc. No. 7-1, Exh. 4.) The case then proceeded to the penalty phase, after which the jury returned unanimous verdicts of life imprisonment without parole for both of the aggravated murder convictions. (Doc. No. 7-1, Exhs. 5-1, 5-2.)

The court, adopting the jury's verdict, sentenced Glenn to life imprisonment without parole for each of the two aggravated murder counts and to a ten-year prison term for the aggravated robbery. (Doc. No. 7-1, Exh. 6.) All sentences were ordered to be served consecutively. *Id.*

### B. Direct Appeal

On February 21, 2006, Glenn, through new counsel, filed a timely Notice of Appeal with the Court of Appeals for the Third Appellate District ("state appellate court"). On July 6, 2006,

2

after not receiving an appellate brief, the court sent counsel a letter warning him that the appeal would be dismissed if the brief was not filed within ten days.  (Doc. No. 7-1, Exh. 9.)  On July 14, 2006, counsel requested that he be allowed to file a merit brief within twenty days and to supplement the record.  (Doc. No. 7-1, Exh. 8.)  On July 27, 2006, the state appellate court dismissed the appeal for lack of prosecution.  (Doc. No. 7-1, Exh. 9.)

On May 21, 2007, Glenn, through new counsel, filed an application to reopen his appeal (Doc. No. 7-1, Exh. 10), which was granted.  (Doc. No. 7-1, Exh. 11.)   Though Glenn raised three assignments of error, only one is at issue in the instant habeas action:

* * *

    2.        The trial court erred by permitting the State to use peremptory challenges to strike the only two remaining African-American jurors.  T.p. 708, 823-4, 1442-7; Fifth and Fourteenth Amendments to the United States Constitution.

* * *

(Doc. No. 7-1, Exh. 12.)  On June 23, 2008, the state appellate court affirmed the conviction and sentence.  (Doc. No. 7-1, Exhs. 15-16.)

On August 1, 2008, Glenn, through counsel, filed a Notice of Appeal to the Ohio Supreme Court raising five propositions of law, two of which are at issue here:

    1.        The existence of a pattern of discriminatory strikes is not a prerequisite either to finding a *prima facie* case in step one of the *Batson* analysis or to finding actual discrimination in step three.  The law of equal protection does not allow "one free bite."  *State v. Wilson*, 85 Ohio St.3d 433, 436, 1999-Ohio-281, applied.

    2.        When the defense makes a *prima facie* case of discrimination and the prosecutor provides a facially race-neutral reason for the strike, the trial court must independently evaluate that reason.  *Batson v. Kentucky*, (1986), 476 U.S. 79.

* * *

(Doc. No. 7-1, Exhs. 17, 18.)  On December 3, 2008, the Ohio Supreme Court dismissed Glenn's appeal as not involving any substantial constitutional question.  (Doc. No. 7-1, Exh. 19.)

### C.  Federal Habeas Petition

Glenn's habeas petition raises two grounds for relief:

    **Ground One**: Petitioner was denied equal protection of the law, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, when the trial court permitted the State to use peremptory challenges to strike the only two remaining African-American jurors.

3

> **Ground Two**: Petitioner's constitutional right to due process of law and
> the protection against the imposition of *ex post facto* law, as guaranteed by the
> Due Process and *Ex Post Facto* Clause of the United States Constitution, were
> violated when the trial court imposed consecutive sentences that were greater than
> the minimum.

(Doc. No. 1.)  In Glenn's Traverse, he withdrew Ground Two.  (Traverse, Doc. 11 at 12.)

### III.  Review on the Merits

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The

relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to
> the judgment of a State court shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable
>> application of, clearly established Federal law, as determined by the Supreme
>> Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the
>> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Clearly established federal law is to be determined by the holdings of the United States

Supreme Court.  *See Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Ruimveld v. Birkett*, 404 F.3d

1006, 1010 (6th Cir. 2005).  However, an explicit statement by the Supreme Court is not

mandatory; rather, "the legal principles and standards flowing from [Supreme Court] precedent"

also qualify as "clearly established law."  *Ruimveld*, 404 F.3d at 1010, *quoting Taylor v.

Withrow*, 288 F.3d 846, 852 (6th Cir. 2002).

A state court's decision is contrary to clearly established federal law "if the state court

arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if

the state court decides a case differently than [the Supreme] Court has on a set of materially

indistinguishable facts."  *Id.* at 413.  By contrast, a state court's decision involves an

unreasonable application of clearly established federal law "if the state court identifies the

correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies

that principle to the facts of the prisoner's case."  *Id.*  However, a federal district court may not

4

find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law. *Id.* at 410-12. "This standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6th Cir. 2006), *citing Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998).

## IV.  Analysis

Glenn contends that the trial court violated his constitutional rights when, during a peremptory challenge of an African-American juror, the court failed to address the third step required by *Batson v. Kentucky*, 476 U.S. 79 (1986). (Doc. No. 1 at 12.) Glenn alleges the court never ruled upon whether the prosecutor's race-neutral explanations were actually valid. He also contends that the state appellate court ignored this assignment of error and, instead, affirmed a trial court ruling that was never made. (Doc. No. 1 at 13.) Respondent argues that Glenn failed to meet his burden under *Batson* because after the State offered its race-neutral reasons for dismissing Jurors 55 and 59, Glenn neither offered any arguments in rebuttal nor preserved his objections to the court's final rulings.

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the United States Supreme Court held that a prosecutor's use of peremptory challenges to eliminate potential jurors on the basis of race violated a defendant's right to equal protection under the Fourteenth Amendment. Essential to any *Batson* challenge is a timely objection by defense counsel. *Batson*, 476 U.S. at 99-100. Once a valid *Batson* objection has been made, the trial court must inquire into the basis for the peremptory challenge. The *Batson* inquiry follows the burden-shifting approach employed in civil rights cases:

> First, the defendant must make a *prima facie* showing that the prosecutor has exercised a peremptory challenge on the basis of race. Second, if the requisite [*prima facie* showing of race-based peremptory challenge] has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

5

*Hernandez v. New York*, 500 U.S. 352, 359 (1991) (citations omitted).

At the second step of the *Batson* analysis, "'the government is not required to persuade the court that its reasons for dismissing the juror were well-founded; rather it need only demonstrate that its reasons were race-neutral.'" *United States. v. Taylor*, 2005 WL 2372037, *13 (W.D. Mich. Sept.27, 2005) (*quoting United States v. Copeland*, 321 F.3d 582, 599 (6th Cir. 2003)), *aff'd*, 279 F. App'x 368 (6th Cir. 2008).  More specifically, the second step of the *Batson* analysis "does not demand an explanation that is persuasive or even plausible.  'At this ... step of the inquiry, the issue is the facial validity of the prosecutor's explanation.  Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral.'" *Purkett v. Elem*, 514 U.S. 765, 767-68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (*quoting Hernandez v. New York*, 500 U.S. 352, 360 (1991)); *see also Rice v. Collins*, 546 U.S. 333 (2006); *United States v. Copeland*, 321 F.3d 582, 599 (6th Cir. 2003) (amended opinion); *United States v. Bartholomew*, 310 F.3d 912, 920 (6th Cir. 2002).  Indeed, "[t]he fact that a prosecutor's reasons may be founded on nothing more than a trial lawyer's instincts about a prospective juror does not diminish the scope of acceptable invocation of peremptory challenges, so long as they are the actual reasons for the prosecutor's actions." *Braxton v. Gansheimer*, 561 F.3d 453, 459 (6th Cir. 2009) (*quoting United States v. Power*, 881 F.2d 733, 740 (9th Cir. 1989) (citation omitted).

The United States Supreme Court "recognized that the[] determinations of credibility and demeanor lie peculiarly within a trial judge's province" and noted the deference accorded to the trial court.  *Snyder v. Louisiana*, 552 U.S. 472, 128 S.Ct. 1203 (2008) (citations and quotations omitted).  "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003); *see also Braxton v. Gansheimer*, 561 F.3d 453, 459 (6th Cir. 2009).  "Great deference" to a trial court's findings on the issue of discriminatory intent "makes particular sense" because "[t]here will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." *Braxton*, 561 F.3d at 459.  "As with the

6

state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility 'lies peculiarly within a trial judge's province.'"  *Hernandez v. New York*, 500 U.S. 352, 364-65 (*quoting Wainwright v. Witt*, 469 U.S. 412, 428 (1985)).  This deferential standard is particularly apt in the habeas context, in which the presumption of correctness applies to factual findings made by the state courts.  28 U.S.C. § 2254(e)(1) (presumption of correctness, rebutted only with clear and convincing evidence); *see, e.g., Miller-El*, 537 U.S at 340; *Hernandez*, 500 U.S. at 366; *Dennis v. Mitchell*, 354 F.3d 511, 527 (6th Cir. 2003), *cert. denied*, 541 U.S. 1068 (2004); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003), *cert. denied*, 540 U.S. 1004 (2003).  Thus, "in the absence of exceptional circumstances," a habeas court should defer to state-court factual findings . . . ."  *Id.* at 366.

Furthermore, a *Batson* claim presents a mixed question of law and fact and "necessarily focuses on the reasonableness of the decisions of the state courts–that is, whether those decisions constituted an unreasonable application of Supreme Court precedent."  *Braxton*, 561 F.3d at 458 (*quoting Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).  *See also Railey v. Webb*, 540 F.3d 393, 397 (6th Cir. 2008) ("Mixed questions of law and fact are reviewed under the 'unreasonable application' prong of the AEDPA.")  However, "the question of 'whether a prosecutor intended to discriminate on the basis of race in challenging potential jurors is, as *Batson* recognized, a question of historical fact.'"  *Braxton* at 458 (*quoting Lancaster*, 324 F.3d at 429 (*quoting Hernandez v. New York*, 500 U.S. 352, 367, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)).  "Under AEDPA, primary or historical facts found by state courts are presumed correct and are rebuttable only by clear and convincing evidence."  *Lancaster* at 429 (citations and internal quotation marks omitted).  In a habeas petition, a court must give credence to § 2254(e)(1)'s requirement that facts found by a state court are presumed correct unless the petitioner rebuts the presumption by clear and convincing evidence.  *Id.* at 429 n.1.

At Glenn's trial, the venire panel underwent an intensive selection process due to the capital specifications in his indictment.  Each potential juror was individually questioned about his or her ability to serve fairly in the case.  There were only two African-Americans on the venire panel, Jurors 55 and 59, and both were removed after peremptory challenges were made

7

by the State.

Juror 55 indicated to the court early in the *voir dire* process that "[he has] a serious hearing problem." (Doc. No. 8-1 at 42-43.) He reiterated that he was wearing a hearing aid and although "[he could] hear, [he] just can't understand" what was being said during the opening phases of the trial. *Id.*

After the prosecution used a peremptory challenge to excuse Juror 55, the following colloquy occurred:

> DEFENSE COUNSEL (Mr. Schumacher): Well, at this point, your Honor, obviously we have to make a challenge under *Batson v. Kentucky* to show a pattern to eliminate minorities. At this point he is the only black African-American juror in the panel. So, at least I'm making the challenge, I guess, at least nominally at this point in bringing it to the attention of the record and the Court.

(Doc. No. 8-7 at 54-55.) The court acknowledged that Juror 55, the defendant, and one of the victims were of African-American descent. *Id* at 55. He then asked the prosecutor to state his reason for exercising the peremptory.

> PROSECUTOR (Mr. Waldick): Your Honor, it is our feeling that we challenged him on cause initially and we believe that as a result of the same reasons we listed at the time of cause we would incorporate our reasons for cause within our reasoning here now. That is, one, he has told us that he's against the death penalty. He also indicated that he had a bad memory – he couldn't remember what was said five minutes ago. Finally, he said not only was he morally, but he was also religiously against or opposed to the death penalty.

> THE COURT: Okay. As the Court reviews the number of racial group members in African-Americans that are on the venire panel, the nature of the crime, the race of the defendant, and the race of the alleged victims, the questions and statements during voir dire that the Court made note of, the Court would find that there is a facially race neutral reason given by the State. The Court understands and has applied the *Batson* test and would overrule the challenge at this time finding there has not been a pattern of strikes against African-Americans at this point. As I said before, there is a facially race neutral reason given for the peremptory. So, for the record, then, the objection as it was stated would be overruled at this point.

(Doc. No. 8-7 at 55-56.) No further objection was made by defense counsel, nor did he argue that the prosecutor's reasons were pretextual. The trial court overruled the *Batson* challenge with regard to Juror 55, thereby implicitly crediting the prosecutor's race-neutral reason.

As to the second African-American, Juror 59, the following colloquy took place after the state exercised a peremptory challenge:

8

Mr. SCHUMACHER (Defense counsel): Your Honor, at this time we would also note that this is the second of two African-Americans that have appeared on the panel, and therefore, we would challenge this under *Batson v. Kentucky*.

THE COURT: Okay.  There's a challenge again for the State's fifth peremptory challenge of number fifty-nine.  Again, from the Court's recollection and its notes, obviously number fifty-nine is an African-American individual.  Again, by my count, he is the second of only two from that group.  Unless somebody has some other information, I think he's the second of two that were on the thirty-three that's African-American.  Considering the nature of the crime, the defendant is African-American, and at least one of the victims is an African-American, what's the –well, I think the burden would shift at this time to the State to offer its reasons for the strike.

MR. WALDICK (Prosecutor): Yes, your Honor.  We would, again, incorporate the reasons we elicited, or we gave the Court on our challenge for cause initially, or, with the first time through with this particular juror.  He indicated that he couldn't understand why Tookie Williams had to be executed.  He didn't say it in those words, but that was the drift that I got in talking to him.  For the record, Tookie Williams, frankly, in reviewing this later one, Tookie Williams was the founder of the CRIPS who had been convicted, apparently, of a quadruple homicide and I believe it was in California.  He indicated that he was against the death penalty.  He answered two of the Court's, well, what I would call super charge *Witherspoon/Witt* questions in the affirmative.  He was wishy-washy on unequivocally following the law.  He indicated he lived in the neighborhood.  He knew both the victims and he was familiar with some of the facts.  He said he had heard all kinds of things.  For those reasons we believe – well, those are our reasons for asking him to be excused.

THE COURT: Just for the record, Mr. Schumacher, do you want to put anything else on the record in regards to your objection?

MR. SCHUMACHER: Your Honor, we'll stand on this as is.  I think the standard obviously is different that what we were discussing on other challenges.  So I think the Court has to decide whether or not it was a race neutral reason, or not.  We would indicate, though, that it appears to be a pattern.

THE COURT: All right.  Well as I understand *Batson*, the first part is that the defendant needs to make out a *prima facie* case of purposeful discrimination.  Again, we look at the number of African-Americans who were on the final thirty-three, and I believe that's two.  This is the second of those two to be struck by the State.  Given the nature of the crime, the race of the defendant and that of at least one of the victims all being African-American, this is the second strike of members of the African-American race that are on the jury.  I also have to look at the questions and the responses given during voir dire.  Again, as with all the jurors, the Court has kept notes.  The Court doesn't find that the defense has made out a *prima facie* case of purposeful discrimination.  But, even if they did and the burden shifts to the State, I find that the State has offered a race neutral reason for the strike.  The reason that it's race neutral is, again, as indicated, number fifty-nine did voice some opposition to the death penalty.  He had an inclination not to, or, did express some sympathy with the Tookie Williams case, which is a race neutral reason to strike him.  Also, he did live in the same area and neighborhood where the crime was committed.  So, that's the reason the Court finds it to be facially race neutral.  Again, I would find that there has not been a purposeful discrimination, or at least a showing of that, by the State.  So, for those reasons,

9

the Court will overrule the *Batson* objection.

(Doc. No. 8-7 at 57-59.)  Again, defense counsel made no further objection and offered no

argument as to the State's reasons being pretextual.

The state appellate court concluded that the trial court did not err in overruling the *Batson*

objections regarding Jurors 55 and 59 as follows:

{¶ 18} In his second assignment of error, Glenn argues that the trial court erred in permitting the State to use its peremptory challenges to strike the only two remaining African-American prospective jury members.

{¶ 19} The United States Supreme Court has addressed this issue in *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69.

"A court adjudicates a *Batson* claim in three steps." *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 106, *quoting State v. Murphy* (2001), 91 Ohio St.3d 516, 528, 747 N.E.2d 765. "First, the opponent of the peremptory challenge must make a *prima facie* case of racial discrimination. Second, if the trial court finds this requirement fulfilled, the proponent of the challenge must provide a racially neutral explanation for the challenge. *Batson*, 476 U.S. at 96-98, 106 S .Ct. 1712, 90 L.Ed.2d 69." *Id*. Third, the trial court must decide, based on all the circumstances, whether the opponent has proved purposeful racial discrimination. *Batson* at 98, 106 S.Ct. 1712, 90 L.Ed.2d 69. *See also Purkett v. Elem* (1995), 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834. A trial court's finding of no discriminatory intent will not be reversed on appeal unless clearly erroneous. *State v. Hernandez* (1992), 63 Ohio St.3d 577, 583, 589 N.E.2d 1310, following *Hernandez v. New York* (1991), 500 U.S. 352, 368, 111 S.Ct. 1859, 114 L.Ed.2d 395.

In step three, the trial court may not simply accept a proffered race-neutral reason at face value, but must examine the prosecutor's challenges in context to ensure that the reason is not merely pretextual. "[T]he rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it." *Miller-El v. Dretke* (2005), 545 U.S. 231, 251-252, 125 S.Ct. 2317, 162 L.Ed.2d 196. If the trial court determines that the proffered reason is merely pretextual and that a racial motive is in fact behind the challenge, the juror may not be excluded. *Id*. at 252, 125 S.Ct. 2317, 162 L.Ed.2d 196.

*State v. Frazier*, 115 Ohio St.3d 139, 147-148, 873 N.E.2d 1263, 2007-Ohio-5048. *See also State v. Goode*, 3rd Dist. No. 1-07-55, 2008-Ohio-1651.

{¶ 20} "The ultimate question is whether the trial court's analysis of the contested peremptory strike was sufficient to preserve a constitutionally permissible jury-selection process." *State v. Brown*, 8th Dist. No. 84059, 2004-Ohio-6862, ¶ 21.

{¶ 21} In the present case, the State used all six of its peremptory challenges. The fourth and fifth challenges were utilized to challenge prospective jurors who were African-American. Specifically, Glenn challenges the use of peremptory challenges to excuse prospective jurors numbered 55 and 59, as racially

10

motivated.FN2

> FN2. We note that the trial court opted not to identify jurors by
> their names, but instead assigned each prospective juror a number,
> in order to safeguard their confidentiality. Therefore, this Court
> refers to the dismissed jurors by number only.

{¶ 22} The State's fourth peremptory challenge was used to exclude Prospective
Juror 55. At voir dire, Prospective Juror 55 stated that he had difficulty hearing.
(Tr. p. 684). Moreover, Prospective Juror 55 stated that he was opposed to the
death penalty.

> The Court: Okay. So, I need to ask you now, number fifty-five, are
> you religiously, morally, or otherwise against the imposition of the
> death penalty?
>
> Prospective Juror: Yes, sir.
>
> The Court: Okay. Now, even though you've indicated that you
> have a conscientious, religious, or other objection to the death
> penalty if you are selected as a juror in this case, number fifty-five,
> will you nevertheless, follow my instructions as Judge and fairly
> consider the imposition of the sentence of death if appropriate in
> this case? Your answer must be 'yes' or 'no'.
>
> Prospective Juror: Yes.

(Tr.p.686).

{¶ 23} Prospective Juror 55 was further questioned on his views on the death
penalty.

> Mr. Waldick: When the Court asked you earlier today, or just a
> minute ago, you said you were against the death penalty.
>
> Prospective Juror: I'm against putting a man to death myself. I'm
> not against the State doing it.
>
> Mr. Waldick: Okay. Well, explain that. What do you mean by that?
>
> Prospective Juror: If I were to decide if somebody should go to the
> death, or, have the death penalty, well, I wouldn't want to make
> that decision.

(Tr.p.688).

{¶ 24} After voir dire of Prospective Juror 55, the State challenged him for cause
stating that "he indicted [sic] that he has memory problems-he can't remember
what was said five minutes ago." (Tr.p.707). The trial court denied the State's
challenge for cause. The State, however, subsequently used a peremptory
challenge to remove Prospective Juror 55 from the jury.

{¶ 25} Glenn then made a *Batson* challenge to Prospective Juror 55's dismissal.
The trial court requested that the State provide a reason for challenging
Prospective Juror 55. The State explained that:

11

> [I]t is our feeling that we challenged him on cause initially and we believe that as a result of the same reasons we listed at the time of cause we would incorporate our reasons for cause within our reasoning here now. That is, one, he has told us that he's against the death penalty. He also indicated that he had a bad memory-he couldn't remember what was said five minutes ago. Finally, he said not only was he morally, but he was also religiously against or opposed to the death penalty.

(Tr.p.1244-1245).

{¶ 26} The trial court proceeded to evaluate the arguments given the totality of the circumstances.

> As the Court reviews the number of racial group members in African-Americans that are on the venire panel, the nature of the crime, the race of the defendant, and the race of the alleged victims, the questions and statements during voir dire that the Court made note of, the Court would find that there is a facially race neutral reason given by the State. The Court understands and has applied the *Batson* test and would overrule the challenge at this time finding there has not been a pattern of strikes against African-Americans at this point.

(Tr.p.1244).

{¶ 27} After reviewing the record, this Court cannot state that the trial court's conclusion was clearly erroneous. Prospective Juror 55 stated that he had a moral and religious opposition to the death penalty, hearing trouble, and a poor memory. Thus, the trial court did not err in overruling the *Batson* challenge with respect to Prospective Juror 55.

{¶ 28} The State used its fifth peremptory challenge to excuse Prospective Juror 59. At voir dire, Prospective Juror 59 stated that he was vaguely familiar with the victims. (Tr. p. 810). He also stated that he lived in the neighborhood where the murders occurred and had heard various rumors concerning the murders. ( Id .).

> The Court: Are you, number fifty-nine, religiously, morally, or otherwise against the imposition of the death penalty?

> Prospective Juror: I am against it.

> The Court: Okay. I appreciate your answer. Even though you've indicated either a conscientious, religious, or other objection to the death penalty if you are selected as a juror in this case will you, nevertheless, follow my instructions as Judge and fairly consider the imposition of the sentence of death if appropriate in this case? You must answer that 'yes' or 'no'.

> Prospective Juror: I wouldn't.

> The Court: Okay. I don't want to dwell on this too much. I appreciate that. There's no right or wrong answer. Will your views on the death penalty prevent or substantially impair your ability as a juror to perform your duty in accordance with your oath and the Court's instructions?

Prospective Juror: No.

(Tr.p.812).

{¶ 29} Prospective Juror 59 was further questioned by the State concerning his views on the death penalty. He offered the following explanation for why he was undecided concerning the death penalty:

> Yea. I mean, at the time I, you know-well, I filled it out. Then I started to thinking about it. I've been reading like the story of Stanley Tookie Williams, the Los Angeles co-founder of the Crips. I was sitting there and I was watching a movie of his life and I'm reading the book and he's telling like how things were when he was out there doing wrong. Since then I watched how he, you know, reformed himself. It seemed like, you know, just because he was, you know, the founder of the Crips they just didn't want to see him live. They wanted to set an example, you know. To me, that's how I felt. I just think it's a cold-blooded thing, I mean. Really, my religion, too. It's not for me to decide whether someone dies or not; you know? That's always been what my grandpa said. I've got good friends right now that's in church, you know. He always says that. When people tell you like, you know, you might be playing around and you say something funny and somebody goes 'you're going to hell', he's like 'don't say that, man, because it's not you determining if you're going to hell, or if you die, or not, or if somebody dies or not'. That's just the way I feel, you know.

(Tr.p.814).

{¶ 30} The State challenged Prospective Juror 59 for cause because "he answered three of the four questions in a way which would lead you to believe that he could under no circumstances impose, or, fairly consider the imposition of the death penalty. We believe him to be impaired, substantially impaired. His views on the death penalty substantially impair his ability to be a fair and impartial juror." (Tr. p. 822). The trial court overruled the State's challenge for cause. The State, however, used a peremptory challenge to remove Prospective Juror 59 from the jury.

{¶ 31} Glenn then made a *Batson* challenge to Prospective Juror 59's dismissal. The trial court requested that the State provide a reason for challenging Prospective Juror 59. The State explained that:

> We would, again, incorporate the reasons we elicited, or we gave the Court on our challenge for cause initially, or, with the first time through with this particular juror. He indicated that he couldn't understand why Tookie Williams had to be executed. He didn't say it in those words, but that was the drift that I got in talking to him. For the record, Tookie Williams, frankly, in reviewing this later on, Tookie Williams was the founder of the CRIPS who had been convicted, apparently, of a quadruple homicide and I believe it was in California. He indicated that he was against the death penalty. He answered two of the Court's well, what I would call super charge *Witherspoon/Witt* questions in the affirmative. He was wishy-washy on unequivocally following the law. He indicated he

13

lived in the neighborhood. He knew both the victims and he was familiar with some of the facts. He said he had heard all kinds of things. For those reasons we believe-well, those are our reasons for asking him to be excused.

(Tr.p.1245-1246).

{¶ 32} The trial court proceeded to evaluate the arguments given the totality of the circumstances.

> Well, as I understand *Batson*, the first part is that the defendant needs to make out a *prima facie* case of purposeful discrimination. Again, we look at the number of African-Americans who were on the final thirty-three, and I believe that's two. This is the second of those two to be struck by the State. Given the nature of the crime, the race of the defendant and that of at least one of the victims all being African-American, this is the second strike of members of the African American race that are on the jury. I also have to look at the questions and the responses given during voir dire. Again, as with all the jurors, the Court has kept notes. The Court doesn't find that the defense has made out a *prima facie* case of purposeful discrimination. But, even if they did and the burden shifts to the State, I find that the State has offered a race neutral reason for the strike. The reason that it's race neutral is, again, as indicated, number fifty-nine did voice some opposition to the death penalty. He had an inclination not to, or, did express some sympathy with Tookie Williams case, which is a race neutral reason to strike him. Also, he did live in the same area and neighborhood where the crime was committed. So, that's the reason the Court finds it to be facially race neutral. Again, I would find that there has not been a purposeful discrimination, or at least a showing of that, by the State. So for those reasons the Court will overrule the *Batson* objection.

(Tr.p.1246-1247).

{¶ 33} After reviewing the record, this Court cannot find that the trial court's conclusion was clearly erroneous. Prospective Juror 59 stated that he had a moral and religious opposition to the death penalty, as well as prior familiarity with the case due to knowing the victims and living in the neighborhood where the murders occurred. Thus, the trial court did not err in overruling the *Batson* challenge with respect to Prospective Juror 59.

 (Doc. No. 7-1 at 207.)

As to Juror 59, Glenn does not argue that the trial court erred in its three-step analysis under *Batson*.[2]  Nor does Glenn argue that the state appellate court's analysis was unreasonable.

---

[2]The State's race-neutral reasons for exercising peremptory challenges against Juror 59 were that he opposed the death penalty and because he knew the victims and lived in the neighborhood where the murders occurred.

Instead, he appears to argue that the State exhibited a pattern of striking African-American jurors, both for cause and on peremptory challenges.  Glenn fails to explain or cite any law showing that the State's attempt to excuse Jurors 55 and 59 for cause violated his Fourteenth Amendment rights or was otherwise improper.  *See Williams v. Trombley*, 2009 WL 1689477, *5, Case No. 07-cv-12318 (E.D. Mich. Jun. 16, 2009).

As to Juror 55, the State based its peremptory challenge upon the juror's opposition to the death penalty and his hearing and memory problems.  The trial court found these were "facially race neutral reason[s]" and overruled the *Batson* objection.  (Doc. No. 8-7 at 55-56.)  Defense counsel made no further objections nor argued that the reasons given by the State for the challenge were pretextual.

There is no clearly established federal law issued by the Supreme Court mandating that the trial court undertake specific fact-finding exercises prior to rejecting a *Batson* challenge.  *See Miller-El v. Cockrell*, 537 U.S. 322, 347 (2003) (reaffirming that the Supreme Court "adhere[s] to the proposition that a state court need not make detailed findings addressing all the evidence before it" in relation to a *Batson* claim).  *See also Smulls v. Roper*, 535 F.3d 853, 860 (8th Cir. 2008) ("a trial court's ruling on a *Batson* challenge is itself a factual determination, and we have repeatedly upheld ruling made without additional reasoning"; *McKinney v. Artuz*, 326 F.3d 87, 100 (2d Cir. 2003) ("Although reviewing courts might have preferred the trial court to provide express reasons for each credibility determination, no clearly established federal law required the trial court to do so.")

Moreover, in a similar case concerning a *Batson* challenge in the Sixth Circuit, the Court concluded as follows:

> An inference of discrimination might arise, for example, from an unexplained pattern of strikes against jurors of one race, from the prosecutor's handling of jurors during the voir dire process generally or from some characteristic relating to the juror who is the subject of the challenged strike.  Some showing must be made to justify the inference, however.  In this regard, "[t]he defendant has the burden of producing a record in support of a *prima facie* claim of purposeful discrimination."  *Id.*  It is true, moreover, that while the prosecution may assist the defense in creating a record by tendering the reasons for its strikes before the primate facie process is completed, it "is under no obligation to help establish the *prima facie* case."  **Where the defendant has put nothing in the record from which a reviewing court can discern an inference**

15

**of discrimination, no burden shifting occurs and no further inquiry by the trial court is needed.**

*Stallings v. Bagley*, 561 F.Supp. 2d 821, 854 (N.D. Ohio 2008) (internal citations omitted and emphasis added).  The Sixth Circuit also found no discriminatory intent when a Latino juror was dismissed for being "too unintelligent and disinterested."  *United States v. Tucker*, 90 F.3d 1135, 1142 (6th Cir. 1996).  The Court explained that a peremptory strike "is supposed to be peremptory; the prosecution does not have to articulate a rationale that would support a 'for cause' challenge."  *Id.* at 1142-43.

Glenn also argues that since the trial court made no ruling as to Juror 55 under step three of the *Batson* analysis, the state appellate court affirmed a non-existing finding.  As set forth above, the trial court properly ruled on the objection.  The defense counsel failed to offer any reasons showing that the State's reasons were pretextual.  *See, e.g., Hightower v. Schofield*, 365 F.3d 1008, 1034-35 (11th Cir. 2005) (accepting the Georgia trial court's finding, without further elaboration, that the defendant failed to "establish purposeful discrimination" where the defendant provided no evidence to the trial court to discredit the prosecutor's proffered justifications, leaving the trial court free to accept the prosecutor's reasons at face value (internal marks and brackets omitted)), *vacated by* 545 U.S. 1124, 125 S.Ct. 2929, 162 L.Ed.2d 863 (2005), *reinstated by* 459 F.3d 1067, 1072 (11th Cir. 2006).  Here, the record supports the State's claimed reasons which the defense counsel failed to rebut.  Glenn has not proven purposeful discrimination.

Lastly, Glenn contends that after the trial court properly applied the three-step *Batson* analysis to Juror 59, it should have returned to Juror 55's peremptory challenge and made a specific third-step ruling, in spite of defense counsel making no request that this be done.  The United States Supreme Court addressed this issue in a case in which a state trial court overruled a *Batson* challenge without giving an explanation:

> During jury selection, he objected to the prosecutor's use of peremptory challenges to strike two black men from the jury panel, an objection arguably based on *Batson v. Kentucky*, 476 U.S. 79, 90 L.Ed. 2d 69, 106 S.Ct. 1712 (1986). The prosecutor explained his strikes . . .
>
> * * *

16

> The state trial court, without explanation, overruled respondent's objection and empaneled the jury. On direct appeal, respondent renewed his *Batson* claim. The Missouri Court of Appeals affirmed, finding that the state's explanation constituted a legitimate 'hunch' and that 'the circumstances failed to raise the necessary inference of racial discrimination.' *State v. Elem*, 747, S.W.2d 772, 775 (Mo. App. 1988).

*Purkett v. Elem*, 514 U.S. 765, 767 (1995). The Supreme Court examined the Missouri Court of Appeal's decision and concluded that it "properly proceeded to step three, where the state court found that the prosecutor was not motivated by discriminatory intent." *Id*. at 769. The Supreme Court looked to the state court decisions, including both the state trial and appellate courts, in determining whether the state reasonably applied *Batson* and concluded there was no discriminatory intent. In the instant case, the state appellate court properly looked to the trial court's ruling that the State's reasons were "facially race neutral," and even though the trial court had not returned to apply the third step of the *Batson* analysis to Juror 55, it was evident that Glenn had not proven purposeful discrimination.

Upon review of the record, the prosecutor presented race-neutral explanations for striking Jurors 55 and 59 at the *Batson* hearing and the trial court accepted the reasons. Giving deference to the state court's findings of fact, which Glenn offered no evidence to rebut, the Court concludes that the state appellate court's decision was not unreasonable. 28 U.S.C. § 2254(e)(1); *Hernandez*, 111 S.Ct. at 1868. The state appellate court applied the appropriate federal law and concluded that the trial court found the State offered race-neutral reasons for excusing Jurors 55 and 59.

## V. Conclusion

For the foregoing reasons, the Magistrate Judge recommends Glenn's Petition be denied.


 s/ Greg White
United States Magistrate Judge

Dated:  December 15, 2009


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and**

17

1 of 18

**Recommendation.**  *See* **28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.**  *See United States v. Walters*, **638 F.2d 947 (6th Cir. 1981).**  *See also Thomas v. Arn*, **474 U.S. 140 (1985),** *reh'g denied*, **474 U.S. 1111 (1986).**